IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA


v.                              CRIMINAL NO. 2:09-00150


MATTHEW A. LEAVITT


**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States hereby submits this Sentencing Memorandum.

I.    **Nature and Circumstances of the Offense and the
      History and Characteristics of the Offender**

      (A)  **Nature and Circumstances of the Offense**

**Instant Offense**

On September 26, 2008, Lauren Reynolds was attempting to drive
from the parking lot of a 7-11 Convenience Store located in
Montgomery, West Virginia, in a vehicle which was registered to
her, and her husband, Twan Reynolds.  Mr. Reynolds was located in
the front passenger seat, their young daughter was sitting in her
car seat behind Mr. Reynolds, and two male acquaintances of the
Reynolds', were also sitting beside their daughter.  Mrs. Reynolds
had stopped at the convenience store to put air in her tires, but
discovered the air pump was broken.

As they were approaching to turn back onto the two-lane street
from the parking lot, police officers, driving a marked Montgomery

city patrol car, with its blue lights flashing, were quickly approaching the Reynolds' vehicle. Mrs. Reynolds, not expecting that the officers were en route to stop her, prepared to let the patrol car pass before turning back on the street. However, the officers abruptly turned onto the parking lot and stopped their vehicle with its front grill abutting the front of the Reynolds' vehicle, thereby blocking it from being driven forward.

Defendant, who was driving the patrol car, and his partner, Shawn Hutchinson ("Hutchinson"), both of whom were Montgomery city police officers, immediately emerged from their car. Both wore standard issue police uniforms, badges, gun belts, which included their holstered service weapons.[1] Defendant and Hutchinson proceeded towards the Reynolds' vehicle and Defendant repeatedly ordered Mrs. Reynolds to step out of her vehicle. Mrs. Reynolds asked why they were ordering her out of the vehicle, and the officers accused her of driving while intoxicated. Mrs. Reynolds complied with the officers' commands but repeatedly insisted that she had not been drinking, she was not intoxicated, and requested

---

[1]When Defendant and Hutchinston stepped out of the vehicle, Mrs. Reynolds recognized the officers as the same two that she had encountered at a high school football game from which the Reynolds and their daughter had just left. At the game, Mrs. Reynolds grew wary of the officers at because when she walked away from her husband to go to the concession stand or to other areas, they appeared to follow her and observe her with a watchful eye. Incidently, the Reynolds had agreed to give the two adult males who were sitting in their back seat, who they knew, a ride from the game back into town.

that she be administered a breathalyzer test which would substantiate her claims. Defendant and Officer Hutchinson ignored Mrs. Reynolds' pleas, and one or both officers reportedly told her that she was under arrest for Driving under the Influence of Alcohol ("DUI").[2]   Due to the officers' bellicose tone and attitude with Mrs. Reynolds, and their ostensibly unjust arrest of her, Mr. Reynolds, still sitting in the front passenger seat, had joined his wife in insisting to the officers that she had not been drinking.  Mr. Reynolds was upset, his daughter was crying in the back seat, and he felt helpless as his, and his wife's pleas, only appeared to anger Defendant more.   Defendant repeatedly told Mr. Reynolds to shut the f*** up.

Soon after Defendant and Hutchinson had ordered Mrs. Reynolds from the car, Lieutenant Burrows, who was second in command to Montgomery's police chief, arrived on the scene in his marked patrol car.  Lt. Burrows, who was working and attired in uniform, approached Defendant and told him to yield to his authority of command.  Lt. Burrows knew Mr. and Mrs. Reynolds and could tell, based on what he saw when he arrived on the scene, that the situation could soon get out of hand.

---

[2]Please note, prior to arresting Mrs. Reynolds for what, she was told, was a DUI charge, neither Defendant nor Hutchinson, never administered any field sobriety tests or administered a preliminary breath test to Mrs. Reynolds.

Defendant responded to Lt. Burrows directive much like he handled the Reynolds' pleas, by telling him [Burrows] to leave him [Defendant] the f*** alone (or words to that effect). Lt. Burrows then ordered Defendant and Hutchinson to stop their actions, which, again, was met by a similar response from Defendant which included an expletive. At that point, Lt. Burrows attempted to physically intervene which resulted in Defendant threatening to arrest Lt. Burrows for "interfering" and making a racial slur towards him.[3] Lt. Burrows, concerned for his safety, angry, and generally helpless at that point, backed away.

As Mr. Reynolds continued to implore the officers that his wife hadn't been drinking, and that she had done nothing wrong, Defendant ordered Officer Hutchinson to deal with Mr. Reynolds. Officer Hutchinson went to the front passenger side door, opened it, and forcibly pulled Mr. Reynolds from his vehicle. Defendant, left the driver's side of the vehicle and joined Officer Hutchinson in his attempt to restrain Mr. Reynolds. In an apparent rage, Defendant struck Mr. Reynolds in the face with a slap jack. As Mr. Reynolds was telling Defendant to stop [beating him], Defendant punched Mr. Reynolds in his face with closed fists. Mr. Reynolds was also pepper sprayed in his face.

Defendant handcuffed Mr. Reynolds and led him to the front of the patrol car, where he put him, face first, on its hood. Mrs. Reynolds, handcuffed, was placed in the backseat of Defendant and

---

[3]It should be noted that Lt. Burrows is African-American. Mr. Reynolds is also African-American and Mrs. Reynolds is white.

Hutchinson's patrol car. Defendant placed Mr. Reynolds, also still handcuffed, in the backseat of Lt. Burrows' patrol car. Words were again exchanged between Defendant and Lt. Burrows, who had not authorized Defendant to place Mr. Reynolds in his patrol car or to take his patrol car. Again, Defendant responded aggressively, dismissing Lt. Burrows' protests, and referred to him by use of an expletive.

Defendant then drove Lt. Burrows' patrol car, alone, with Mr. Reynolds in its backseat to City Hall, which was located within blocks of the 7-11. Hutchinson followed with Mrs. Reynolds. As the officers arrived at City Hall they removed Mr. Reynolds and Mrs. Reynolds from the vehicles, and walked them to the entrance of the building. While Defendant was trying to open the door, Mrs. Reynolds, who was crying, placed her head on Mr. Reynolds shoulder as Mr. Reynolds was trying to console and reassure her.

According to the Reynolds', Defendant, again, in an apparent rage, placed a latex glove on his hand, pepper sprayed his forefinger, and smeared his forefinger that contained the pepper spray on Defendant's eye, placed it up his nose, and across his face.[4]

_____

[4]Mr. Reynolds reports permanent damage to his eye. Further, medical records, that were provided to the United States Probation Officer, revealed that Mr. Reynolds sustained permanent injury to his right eye. An opthamologist diagnosed Mr. Reynolds as suffering a corneal abrasion consistent with traumatic iritis in the right eye, "most likely a result of forceful impact to the right eye..." The doctor further noted that, "His vision is distorted if he looking through wax paper in the right eye."

Just before the Reynolds' were driven to City Hall, Pete Lopez, the police chief of the Montgomery Police Department arrived on the scene.[5] Lt. Burrows quickly conveyed his complaints to Chief Lopez about Defendant's behavior. However, Chief Lopez did nothing to intervene. He watched as Defendant and Hutchinson drive Mrs. Reynolds and Mr. Reynolds from the parking lot towards City Hall. He directed Lt. Burrows to ride with him in his vehicle in order for Lt. Burrows to calm down. Chief Lopez circled the block several times, before he and Lt. Burrows arrived at City Hall.

Paramedics arrived at City Hall to treat Mr. Reynolds. Mr. Reynolds and Mrs. Reynolds, who were being held in the same room, reported that Defendant retrieved the bottle of saline that one of the paramedics was preparing to use to rinse Mr. Reynold's face, squirted a portion of the saline on Mr. Reynolds, and then told the paramedics that Mr. Reynolds did not need treatment. According to Mrs. Reynolds, who is a registered nurse, she began insisting that her husband needed medical treatment, which the paramedics could not deny. Mr. Reynolds received no further treatment at that time.[6]

---

[5]Lopez is no longer employed by the city of Montgomery.

[6]The paramedics, who were interviewed during the course of the investigation, offered inconsistent statements about the extent of Mr. Reynolds' treatment and Defendant's behavior in their presence. Defendant maintains that Mr. Reynolds refused treatment. Defendant signed police documents that night indicating that Mr. Reynolds refused treatment. However, the paramedics were unable to produce their records related to the incident because they could not be found.

At or near this time, Hutchinson removed Mrs. Reynolds from the room and placed her in the room with the intoxilyzer. Hutchinson administered the intoxilyzer to Mrs. Reynolds and the results confirmed that Mrs. Reynolds had not consumed any alcohol that night. Hutchinson, upon viewing the intoxilyzer results, returned to Defendant's location and informed him that the intoxilyzer revealed that Mrs. Reynolds had not been drinking. Mrs. Reynolds, while left alone in the room, tore off the document produced by the intoxilyzer that documented that her blood alcohol content was .000 and placed it in her pocket, due to fear that the officers may attempt to manipulate the results. During this time, Defendant licked Mrs. Reynolds' neck and said, "You like that don't you whore."[7]

When Chief Lopez and Lt. Burress arrived at City Hall, Lt. Burress found Mr. Reynolds crying, handcuffed in a chair, and complaining that he had been beaten by Defendant. Again, Lt. Burrows and Defendant nearly engaged in a physical confrontation. Ultimately the Mayor of Montgomery arrived at City Hall and ordered Defendant and Hutchinson to issue citations to Mr. Reynolds and Mrs. Reynolds and to let them go. Mr. Reynolds was charged with disorderly conduct, obstruction, and two-counts of battery. Mrs.

---

[7]Defendant denies smearing Mr. Reynolds' face with pepper spray or engaging in any crude or lascivious conduct with Mrs. Reynolds.

Reynolds was cited for an open container, disorderly conduct, obstruction, and battery on police officer.[8]

Mr. Reynolds and Mrs. Reynolds were treated at a local hospital after they were released. Mr. Reynolds was thereafter transported to Charleston Area Medical Center, Charleston, WV, for further treatment. In addition to his permanent eye damage, Mr. Reynolds sustained a chipped elbow, and suffered injuries to his head, along with having blood in his urine for approximately two weeks from the time of the incident. Mrs. Reynolds was treated for a sprained left wrist, and bruising to wrists and legs.

## GALL V. UNITED STATES

As this Honorable Court is aware, in <u>Gall v. United States</u>, the Supreme Court held that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse of standard. 552 U.S. 38 (2007). The Court rejected an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. <u>Id.</u> The Court further rejected the use of a rigid mathematical formula that uses the percentage of departure as the standard for determining the strength of the justifications

---

[8] On information and belief, the open container charge arose out of the officers retrieving a bottle of liquor from one of the two passengers sitting in the back seat of the Reynolds' vehicle. If true, there is no indication that there was any connection between that bottle and Mrs. Reynolds, , other than her proximity to it.

required for a particular sentence.  _Id._  The Court noted that it has been a constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  _Id._

In early 2000, Gall, a second year student at the University of Iowa, was invited to join an ongoing enterprise which involved the distribution of ecstasy.  Gall, who then was a user of ecstasy, cocaine, and marijuana, accepted the invitation.  During the ensuing seven months, Gall delivered ecstasy pills to other conspirators, who then sold them to consumers.  A month or two after joining the conspiracy, Gall stopped using ecstasy.  A few months after that, in September, 2000, he advised the other conspirators that he was withdrawing from the conspiracy.  Gall graduated from college and moved to Arizona.  _Id._

After Gall moved to Arizona, he was approached by federal agents and Gall admitted to his limited involvement in the conspiracy.  The agents took no further action at that time.  In April, 2004, approximately a year and a half after the interview with federal agents, and three and a half years after Gall withdrew from the conspiracy, an indictment was returned in the Southern District of Iowa charging him and seven other defendants with participating in a conspiracy to distribute ecstacy, cocaine, and marijuana, that began in or about May 1996 and continued through October 30, 2002.  Gall entered into a plea agreement with the

government, stipulating that he was responsible for, but did not necessarily distribute himself, at least 2,500 grams of ecstasy. At sentencing the district court imposed a downward variance form Gall's advisory range of 30-37 months, and imposed a term of probation. Id.

The Supreme Court determined that Gall's sentence of probation was reasonable. The Court observed, at sentencing, the district court noted several factors which supported the variance, such as: 1) a month or two after joining the conspiracy, Gall stopped using ecstasy, and a few months after that he advised the other co-conspirators that he was withdrawing from the conspiracy; 2) after Gall terminated his participation in the conspiracy, he graduated from the University of Iowa, and first moved to Arizona, where he obtained a job in the construction industry and later to Colorado, where he earned $15 per hour as a master carpenter; 3) Gall had not used any drugs since withdrawing from the conspiracy; 4) when Gall was approached by federal agents while living in Arizona, he confessed to his limited involvement in the distribution of ectasy; 5)approximately 3 1/2 years after Gall withdrew from the conspiracy an indictment was returned in the Southern District of Iowa that charged him and others with conspiracy to distribute ectasy, cocaine and marijuana that began  in or near May, 1996, and continued through October 30, 2002; 6) when Gall received notice of the indictment he moved back to Iowa and surrendered to authorities; and, 7) while free on bond, Gall started his own business in the construction industry, primarily engaged in

subcontracting.  In his first year, his profits were over $2,000 per month.  Id.

The Court observed that the district court further found, while considering the 18 U.S.C. § 3553(a) factors, Gall's explicit withdraw from the conspiracy almost four years before the felony indictment, Gall's post-offense conduct - especially obtaining a college degree and the start of his own successful business, the support of family and friends, his lack of criminal history, and his age at the time of the offense conduct, all warranted the sentence imposed, which was sufficient, but not greater than necessary, to serve the purposes of sentencing.[9]  Id.

Finally, the Court noted that the district court elaborated even further in the court's written findings of facts  why he concluded that the sentence of probation reflected the seriousness of Gall's offenses and no term of imprisonment was necessary:

"Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the defendant, who the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life.  The defendant's post-offense conduct indicates that he neither will return to criminal behavior, nor that he is a danger to society.  In fact, defendant's post-offense conduct indicates

_____

[9]The Court further noted that in the probation officer noted in the presentence report, and the government did not dispute, that Gall had truthfully provided the government with all of the evidence he had of the alleged offenses, he was not a leader, manager, or organizer, and his offense did not involve the use of weapons.  Id.

that he is neither with return to criminal behavior, nor that his a danger to society. In fact, defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but, was the pre-indictment product of the defendant's own desire to lead a better life." <u>Id</u>.

In light of the instant case, it is important to note the Supreme Court's response in <u>Gall</u> to the government's claim that a lenient sentence for a serious offense threatens to promote disrespect for the law. The Court observed that the government's legitimate concern in <u>Gall</u> is at least to some extent offset by the fact that seven of the eight defendants in the case were sentenced to significant prison terms. Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." <u>Id.</u>

**(B) History and Characteristics of the Offender**

Defendant is 31 years old. He is 6'2" and weighs approximately 230 pounds. Defendant graduated from high school in 1997, and joined the military.

Defendant has held several jobs as a police officer, although, he has been unable to maintain long-term employment at any particular municipality. Defendant was a patrolman at Cedar Grove from March 2005 to June 2006 (Defendant claims he was terminated

because "the Mayor didn't like me"); Defendant was a police officer for the town of Madison from May 2006, to July 2006 (he was permitted to resign following reprimands involving his abuse of alcohol and due to an incident with a town resident); Defendant was a police officer for the town of Smithers from September 2006, to March 2008; Defendant was employed for one month in January 2009 at the Gauley Bridge Police Department; and, Defendant was a police officer for the City of Montgomery from January 15, 2007, to April 23, 2009 (Defendant was placed on administrative leave pending removal on April 23, 2009, presumably related to the instant offenses).[10]

Defendant has a long-term history of alcohol abuse. Defendant admits to being a binge drinker, he acknowledged that he began drinking as a teenager, and he stated that he stopped going to bars because of the publicity related to the instant case. Defendant admits that alcohol has caused problems in his personal life and employment history, but he does not believe he needs alcohol treatment or counseling.

Defendant has an extensive military background. He joined the United States Army in 1997, after graduating from high school. He received an honorable discharge in October, 2000, with the rank of Private First Class.[11] Following "9-11" Defendant enlisted in the

---

[10]Since mid-September 2009, Defendant has been employed at Peerless Block and Brick Company. Defendant is also currently enrolled in PIA truck driving school.

[11]While serving in the army, Defendant also received an Article 15 disciplinary action for drinking on duty.

Army National Guard in December, 2001. Defendant was deployed to Iraq in December, 2003, and completed his tour of combat duty there in December, 2004. Defendant was honorably discharged in December, 2004, with the rank of a Sergeant. Following his discharge, Defendant re-enlisted in the West Virginia Army National Guard. Based on Defendant's pleas in the instant case, an action to remove Defendant from the National Guard has been initiated.

## II.  Statutory Objectives

### (A)  To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A sentence within the guideline range would meet these objectives.[12] Defendant's conduct that resulted in the instant offenses caused significant physical harm to Mr. Reynolds, as well as psychological harm to Mrs. Reynolds and their four-year old daughter. Defendant suffered a chipped bone in his elbow, bruises to his face, and permanent damage to his right eye. Due to his injuries, Mr. Reynolds, who is employed as a heavy equipment operator, missed more than three months of work.

Along with suffering a sprained left wrist and bruising to her legs and wrists, Mrs. Reynolds is attending counseling due to anxiety and panic attacks related to the instant offenses, and was

---

[12]As the Court is aware, Defendant pleaded guilty to two misdemeanor offenses which limits the statutory maximum sentence to 12 months incarceration for each count of conviction, or a total of 24 months incarceration. Because Defendant's advisory guideline range exceeds his statutorily authorized maximum sentence, the statutorily maximum sentence is Defendant's guideline range.

diagnosed with post traumatic stress disorder. Mrs. Reynolds, who, as earlier mentioned is employed as a registered nurse, missed approximately two weeks of work due to this incident.

The Reynolds' daughter was also diagnosed with post traumatic stress disorder and continues to experience anxiety. She has received cognitive behavioral counseling at Family Counseling Connection in Charleston for a three month period beginning in October 2008.

Defendant, in an apparent fit of rage, struck Mr. Reynolds in the face with a slapjack, a weapon which, at its tip, is loaded with solid lead. Law enforcement officers are no longer permitted to carry such a weapon (for self-defense) due to its lethal nature. After being struck with the slapjack, Mr. Reynolds pleaded to Defendant to stop hitting him. Despite Mr. Reynolds pleas, Defendant punched Mr. Reynolds in the face, pepper sprayed him, handcuffed him, and, placed him on the hood of Defendant's patrol car.

All of this happened in the presence of Mrs. Reynolds, who was told she was under arrest for a crime that there was no evidence that she committed. She was distraught and screaming at Defendant to stop hurting her husband. Their daughter, who was sitting in her child-seat, was inconsolable as her father was being beaten by a police officer while her mother was frantically begging them to stop.

The government respectfully submits, at least at the time of the instant offenses, Defendant exploited his position as a police

officer and ignored his responsibility to protect the citizens of Montgomery. In an attempt to justify his rage particularly towards Mr. Reynolds, Defendant claims his actions were justified. Defendant, prior to entering his pleas of guilty before this Honorable Court, and even subsequently during his pre-sentence interview, attempted to justify his egregious behavior by the power conferred to him by his authority as a police officer. Defendant not only unlawfully assaulted Mr. Reynolds, he also abused his power as a police officer, and breached the trust instilled to him by the city of Montgomery. Defendant, then, inexplicably, charged them with crimes.

Unlike in <u>Gall</u>, when the Court addressed the government's legitimate concerns that a lenient sentence would not promote respect for the law, there are no unique circumstances here that would suggest that a guideline sentence would not promote respect for the law. Moreover, the government respectfully submits that a sentence below Defendant's guideline range would risk promoting derision for the law not only because of Defendant's serious crimes, but by exploiting his authority he flagrantly breached the trust that citizens must have for all police officers to exercise their power responsibly.

It also important to note, that although the nature of the instant offenses do not lend themselves to a role enhancement, the fate of Mr. Reynolds and Mrs. Reynolds rested squarely in Defendant's hands. Defendant, unlike Gall's limited participation in a large criminal enterprise, was his own criminal enterprise,

and it was he, and nobody else, who was ultimately responsible for the physical and psychological harm inflicted on Mr. Reynolds, Mrs. Reynolds, and their daughter.

Defendant drove the patrol car that day and decided to confront the Reynolds' in their vehicle. Defendant ordered Mrs. Reynolds out of her car. Defendant or Officer Hutchinson at his direction arrested Mrs. Reynolds for DUI. Defendant confronted Mr. Reynolds and forcibly removed him from the car. Defendant stuck Mr. Reynolds with a slapjack, and beat him in the face. Defendant handcuffed Mr. Reynolds and placed him under arrest.

Defendant threatened to arrest Lt. Burrows when he attempted to intervene, and implicitly threatened him with violence if he did not heed his admonition. It was Defendant's choice to transport Defendant in Lt. Burrows patrol car without his permission. It was Defendant's actions that resulted in him and Mr. Reynolds, followed by Hutchinson and Mrs. Ramsey, arriving, alone, at City Hall.

Gall, withdrew from his criminal activities, a short time after he became involved in the enterprise. However, not only did Defendant fail to temper his behavior during the course of this incident, by his choices and actions, he exacerbated the damage and the suffering which they caused.

### (B)  To Afford Adequate Deterrence

A sentence within the guideline range would meet this objective. Defendant has a long history of alcohol abuse. Defendant's own admissions to that effect are corroborated by his arrest in 2001 for DUI, and, his disciplinary action for drinking

on duty while in the military.  Notwithstanding Defendant's admissions regarding his alcohol use and the effects it has had on his life, Defendant told the probation officer that he did not need treatment or counseling for his alcohol use.[13]

The government further respectfully submits that the Court may reasonably infer that Defendant has significant anger control and defiance issues.  What ostensibly was a routine traffic stop, within seconds resulted in Defendant arresting Mrs. Reynolds and Mr. Reynolds, and screaming at them in profanity laced tirades. Even before Defendant began beating Mr. Reynolds, Defendant temporarily re-directed his ire at Lt. Burrows, his superior officer, who, inexplicably, he threatened to arrest.  Further, Defendant's churlish behavior while meeting with the probation officer is another example of Defendant's intemperance.[14]

---

[13]There is no evidence that alcohol contributed to Defendant's behavior that resulted in the instant offenses. However, it should be noted that Gall recognized that his (illegal) drug use contributed to his  participation in the conspiracy and would interfere with turning his life around. Therefore, Gall immediately stopped using drugs after he withdrew from the conspiracy. However, despite the fact that the use of alcohol has interfered with Defendant's professional and personal life, he apparently continues using alcohol, and only recently stopped going to bars due to the publicity from this case.  Therefore, in essence, as opposed to Gall who developed a significant "mitigation record" at the time of his sentencing, Defendant has done little to demonstrate that he has a desire to eliminate those vices from his life that have contributed to many of his problems.

[14]It should be noted that the district court in Gall attributed substantial weight to Gall's age  and inherent immaturity at the time sentence was imposed.  Unlike Gall, who was a college student at the time he joined the conspiracy, Defendant was a grown man at the time of the instant offenses.  Defendant is 31 years old, he has children, and is married.

The government respectfully submits that Defendant's anger issues, his defiance issues, his history of alcohol abuse, and his capacity for violence, further lends strong support to the notion that a sentence within the advisory guideline range is necessary to deter Defendant from engaging in future criminal conduct and to protect the public from Defendant committing future crimes.[15]

### (C)  To Protect the Public from Further Crimes

A sentence within the guideline range would meet this objective.  To avoid the risk of redundancy, the government respectfully adopts its reasoning in part I(A) and parts II(A)(B) of this memorandum to support its position.

### (D)  To Provide Training/Medical Care/Treatment

Defendant could benefit from alcohol-abuse counseling, and anger management classes.

### III.  <u>Sentencing Range/Available Sentences</u>

The statutory maximum term of incarceration is 24 months.  The calculated advisory guideline range by the probation officer is 97-121 months, based on a total offense level of 30 and a Criminal History Category of I.  The Court also has the authority to impose a variance above or below the advisory guideline range.

The government recognizes that Defendant's advisory guideline range exceeds his statutory maximum term of incarceration of 24

---

[15]In April, 2006, Defendant was arrested and charged with Battery in Kanawha County Magistrate Court.  The charge was dismissed in November, 2006.  Defendant was apparently on bond for this offense when he began working as a police officer for the city of Madison in May, 2006.

months.  The government proposed the plea offer that resulted in Defendant's instant offenses of conviction, after fully evaluating the case in its totality (as documented in the pre-sentence report the government presented many witnesses to the grand jury in this investigation), as well as thoughtfully considering the input provided by  Mr. Reynolds and Mrs. Reynolds regarding the disposition of this matter.  The government notes, again as documented in the presentence report, the Defendant has agreed to surrender his West Virginia Law Enforcement Officer's Certification so he will not be no longer be eligible to be hired as a patrol officer.

The government also recognizes that a term of imprisonment of up to 24 months is not unsubstantial.  Based on all of the foregoing,  the government respectfully submits that a sentence within Defendant's statutory guideline range would satisfy the objectives of Section 3553(a).

## IV.  **The Need to Avoid Unwarranted Disparities**

The government submits that a sentence with the Defendant's statutory guideline range would not result in an unwarranted sentencing disparity.

## V.  **Restitution**

Restitution as outlined in the presentence report is applicable in this case, if the Court determines it is appropriate.

Respectfully submitted,

CHARLES T. MILLER
United States Attorney


s/CHARLES T. MILLER
CHARLES T. MILLER
United States Attorney
WV Bar No. 2551
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone:  304-345-2200
Fax:  304-347-5104
Email:  chuck.miller@usdoj.gov

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing "Sentencing Memorandum of the United States" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this the 14th day of October, 2009, to:

> William C. Forbes, Esquire
> Forbes Law Offices
> 1118 Kanawha Boulevard, East
> Charleston, West Virginia 25301


> s/CHARLES T. MILLER
> CHARLES T. MILLER
> United States Attorney
> WV Bar No. 2551
> 300 Virginia Street, East
> Room 4000
> Charleston, WV 25301
> Telephone: 304-345-2200
> Fax: 304-347-5104
> Email: chuck.miller@usdoj.gov